*NIHC, Inc. v. Comptroller of the Treasury*
No. 63, September Term 2013

**Taxation - Income Tax - Corporations - Tax Assessment of Subsidiary without Economic Substance Separate from Parent Corporation on Income Shifted from Parent to Subsidiary.** In *Comptroller v. SYL, Inc.*, 375 Md. 78, 825 A.2d 399 (2003), the Court of Appeals held that a corporate subsidiary that lacked economic substance as a business entity separate from its parent corporation had a sufficient nexus with Maryland such that its income was taxable in Maryland to the same extent as the parent corporation's income. In the instant case, a parent corporation created several subsidiaries, which then engaged in a series of transactions among themselves and with the parent corporation concerning licensing rights to the parent corporation's trademarks, the net effect of which was to shift part of the parent's income to the subsidiaries. The Comptroller assessed the subsidiaries for Maryland income tax on the shifted income. Applying *SYL*, the Maryland Tax Court found that the subsidiaries lacked economic substance separate from their parent corporation, that they had a nexus with Maryland through the parent's business activities, and that their income was taxable in Maryland to the same extent as the parent corporation's income. One of the subsidiaries contested the assessment on the ground that it had mistakenly reported income on its 2002 and 2003 Maryland tax returns – although it had apportioned none of that income to Maryland – and, under a Maryland statute requiring the filing of separate corporate returns, should have reported the income on its 1999 return, which was now outside the period of limitations. The Tax Court rejected that argument. In the circumstances of this case, where the Tax Court found that the income reported on the 2002 and 2003 returns of the subsidiary related to activities of the parent corporation in Maryland during those tax years and that the subsidiary lacked economic substance apart from its parent, and where the subsidiary had not filed amended returns to reflect its new view of how it should have reported that income, the Maryland requirement of separate corporate tax returns did not prohibit the Comptroller from assessing a tax on the income reported on the subsidiary's 2002 and 2003 Maryland tax returns.

IN THE COURT OF APPEALS
OF MARYLAND

No. 63

September Term, 2013

NIHC, INC.

v.

COMPTROLLER OF THE TREASURY

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

Opinion by McDonald, J.

Filed: August 18, 2014

Once upon a time, before the advent of the shot clock, some basketball teams employed a maneuver known as the "four corners offense." This strategy involved a series of passes among team members that seemingly did not advance the ultimate purpose of putting the ball in the hoop, but had the separate purpose of depriving the opposing team of possession of the ball. In a somewhat analogous enterprise, corporate tax consultants devised a strategy that involved a series of transactions passing licensing rights between related corporations and that was motivated by a desire, not to directly enhance corporate profits, but to keep a portion of those profits out of the hands of state tax collectors. Much as the shot clock led to the demise of the four corners offense, judicial decisions during the past two decades have limited the utility of this tax avoidance strategy.[1]

This case illustrates a variation on that theme. Nordstrom, Inc. ("Nordstrom") created several subsidiary corporations, including Petitioner NIHC, Inc. ("NIHC"), which then engaged in a series of transactions with Nordstrom and with each other, involving the licensing rights to Nordstrom's trademarks. When the dust settled, the rights to use Nordstrom's trademarks ended up where they had begun – with Nordstrom. But Nordstrom's Maryland taxable income was significantly reduced. NIHC, although it had engaged in no value-creating business activity itself, recognized a significant gain – putatively beyond the reach of Maryland taxation – that was ultimately related to the reduction in Nordstrom's Maryland taxable income. From the perspective of the Respondent Comptroller, the

---

[1] *See, e.g., Comptroller v. SYL, Inc.*, 375 Md. 78, 825 A.2d 399, *cert. denied*, 540 U.S. 984 *and* 540 U.S. 1090 (2003); *Geoffrey, Inc. v. South Carolina Tax Commission*, 437 S.E.2d 13 (S.C.), *cert. denied,* 510 U.S. 992 (1993).

transactions appeared to be an effort to shift income from Nordstrom – where a portion of it would be taxable by Maryland – to subsidiaries that arguably had no nexus to Maryland – where the income would escape Maryland taxation. The Comptroller did not accept that conclusion and issued tax assessments against the subsidiaries' income. The Tax Court concluded, and the Circuit Court and the Court of Special Appeals affirmed, that the subsidiaries, including NIHC, lacked economic substance separate from Nordstrom and, applying a recent decision of this Court, that their income had a nexus with Maryland through Nordstrom's business activities and was therefore taxable by Maryland.

There is an additional feature that makes this case distinctive: NIHC (actually, Nordstrom, on behalf of NIHC) contends that it misunderstood the differences in the ways in which corporations must file returns federally and in Maryland and that it made a mistake in reporting income on its Maryland returns for 2002 and 2003 – a mistake which, it argues, should absolve it from paying the assessed tax. In particular, federal law provides for the filing of a consolidated return by related corporations while Maryland law requires the filing of separate returns by related corporations. NIHC asserts that, under Maryland's separate reporting requirement, it should have reported – and thus paid Maryland income tax – on the entire gain it recognized as a result of the transactions with Nordstrom and the other subsidiaries in 1999, a tax year now outside the statute of limitations, and that it instead mistakenly reported a portion of that income on its Maryland returns for the tax years in question – tax years 2002 and 2003. The Tax Court held that the separate reporting

2

requirement in Maryland did not prohibit Maryland taxation of the income actually reported on the 2002 and 2003 NIHC returns. The Circuit Court held otherwise, but the Court of Special Appeals reversed.

We agree with the Court of Special Appeals that the decision of the Tax Court should be upheld on judicial review. There appears to be no question that income recognized by NIHC from these transactions has a connection to business activities of Nordstrom in Maryland during 2002 and 2003, that a portion of that income was reported on NIHC's Maryland returns for 2002 and 2003 (which were never amended to reflect its current theory), and that the income is taxable by Maryland. The fact that NIHC may have made a series of mistakes in the preparation of its Maryland tax returns, as a result of transactions apparently devised to avoid state taxation, does not entitle it to escape its tax liability on that income.

## Background

*Corporate Family Portrait*

The underlying facts are not in dispute. Nordstrom is a nationally known retailer with its principal place of business in Seattle, Washington. During the time period relevant to this

case, it operated stores in 27 states, including Maryland.[2]  During that time, Nordstrom filed

consolidated federal income tax returns with its domestic subsidiary corporations.[3]

In the mid-1990s, Nordstrom decided to transfer its trademarks to a subsidiary for tax

purposes, according to a plan labeled the "anti-*Geoffrey* strategy" by its tax consultant.[4]  To

---

[2]During that time, Nordstrom operated four department stores, two discount stores, and one distribution center in Maryland.

[3]The Internal Revenue Code permits an affiliated group of corporations, consisting of a parent corporation and more than 80 percent-owned domestic subsidiaries, to file consolidated returns.  26 U.S.C. §1504(a).

[4]A representative of Nordstrom testified at the Tax Court hearing in this case that the transfer was motivated by the company's desire to avoid a personal property tax on intangibles in Washington state that might be extended to its trademarks.  Documents admitted in evidence in the Tax Court indicated that the corporate structure and transactions were also part of a strategy devised by Nordstrom's tax consultant, Deloitte & Touche LLP, to  circumvent state court rulings that permitted states to tax the income of foreign subsidiaries created with the purpose of holding intangible assets and shifting income beyond reach of the tax collector.  Deloitte & Touche referred to the plan as an "anti-*Geoffrey* strategy" – a reference to a South Carolina Supreme Court decision that held that South Carolina could tax royalties received by an out-of-state subsidiary holding the trademarks of its parent.  *Geoffrey Inc. v. South Carolina Tax Commission*, 437 S.E.2d 13 (S.C.), *cert. denied*, 510 U.S. 992 (1993).  In *Geoffrey*, the retailer Toys R Us created a second-tier subsidiary (Geoffrey, Inc.), to which it transferred trademarks and trade names; the subsidiary then licensed them back in return for royalties paid by the parent, which had the net effect of shifting income from the parent to a subsidiary that arguably did no business in South Carolina.  The South Carolina Supreme Court held that the royalty income of Geoffrey, Inc. had a nexus with South Carolina through the use of the trademarks in that state by Toys R Us, and was subject to taxation in South Carolina without offending the Commerce Clause or Due Process Clause of the federal constitution.

While the Nordstrom representative acknowledged that the company had carried out the anti-*Geoffrey* strategy proposed by Deloitte & Touche, she insisted that the holding company structure was motivated primarily by a desire to avoid the Washington state personal property tax.  In any event, there appears to be no dispute that the creation of the
(continued...)

carry out that plan, in late 1996, Nordstrom created subsidiary corporations called NTN, Inc. ("NTN") and NIHC, Inc. ("NIHC") in Colorado; a few months later, in March 1997, it created a third subsidiary in Colorado called N2HC, Inc. ("N2HC"). Nordstrom owned the stock of all three subsidiaries.

During the relevant time period, all of the officers of NIHC and N2HC were officers or employees of Nordstrom. Both corporations occupied rented office space in Portland, Oregon, staffed by a paralegal employed by N2HC. The operating expenses of the affiliates were relatively minimal. NIHC and N2HC had little income or expense other than that related to the trademark transactions described below.

*Passing the Trademark Rights around the Corporate Family*

Nordstrom transferred its trademarks to NTN in March 1997, and NTN in turn gave Nordstrom a license to continue to use the trademarks. In April 1997, Nordstrom transferred its stock in NTN and NIHC to N2HC for cash. Thus, relevant to the discussion below, N2HC became the sole shareholder of NIHC.

On January 31, 1999, the license agreement between NTN and Nordstrom was terminated. NTN then entered into a license agreement with NIHC that granted NIHC a non-exclusive license to use and sublicense the Nordstrom trademarks.[5] On the same day, NIHC

---

[4](...continued)
subsidiaries and the ensuing inter-company transactions originated as an effort to avoid state taxes, as opposed to an effort to enhance the retailer's revenue or profits.

[5]NTN eventually assigned the trademarks to NIHC in January 2001.

distributed to N2HC, its parent corporation, the license agreement with NTN. Thus, as of

the end of January 1999, N2HC had the right to license Nordstrom's trademarks and the right

to any income generated through the exercise of that right.

The next day – February 1, 1999 – N2HC entered into a license agreement with

Nordstrom under which N2HC granted Nordstrom a license to use the trademarks for an

arms-length royalty.[6] Nordstrom paid N2HC royalties during the relevant time period. For

the tax years 2002, and 2003, Nordstrom paid N2HC royalties in the amount of

$197,802,386, and $212,284,273, respectively.[7] N2HC in turn made loans back to

Nordstrom in slightly lesser amounts during the same period.[8]

At the conclusion of these transactions, Nordstrom continued to have the right to use

the trademarks; the trademarks were the property of NIHC; and N2HC had the right to

license the trademarks and receive royalties from Nordstrom. During the relevant period,

trademarks were licensed only to Nordstrom, NIHC conducted no business other than owning

---

[6]NIHC passed the right to license Nordstrom trademarks from NTN to N2HC on the same day that it received the licensing right from NTN. NIHC did not directly license the trademarks to Nordstrom or directly receive a royalty from Nordstrom.

[7]Deloitte & Touche appraised the value of the trademarks and determined an appropriate royalty rate to be paid by Nordstrom. As of October 31, 1998, the value of the trademarks was determined to be approximately $2.8 billion. Deloitte & Touche did not determine the value of the licensing agreements.

[8] N2HC made loans back to Nordstrom of approximately two-thirds of the royalties in each of those years, which Nordstrom used for operating capital. Nordstrom paid N2HC interest, but paid back only small percentages of the principal of the loans. According to testimony at the Tax Court hearing, N2HC did not make loans to other entities.

the trademarks, and both NIHC and N2HC had no earnings other than those resulting from the transactions among the affiliates described above. The net effect was to shift income from Nordstrom to the subsidiaries which, considered in isolation from their parent, had no connection to Maryland.[9]

*Accounting of the Trademark Transactions for Federal Tax Purposes*

According to the analysis of Nordstrom's tax consultant, under the federal tax code, the distribution of the license agreement from NIHC to N2HC was considered the distribution of appreciated property that would be recognized as a gain to NIHC under §311(b) of the Internal Revenue Code, 26 U.S.C. §311(b).[10] According to that analysis,

---

[9]The Comptroller's final determination letter later summarized the effect of these transactions:

> ... These transactions ensured that licensing expenses were incurred by Nordstrom and made payable to N2HC, an entity operating outside of Maryland. By setting up NIHC, Nordstrom indirectly created licensing expenses attributable to inter-company intangible property transfers, where previously, none would have existed. By doing so, a significant portion of Nordstrom's income was moved out of Maryland.

[10]That statute states an exception to the general rule set forth in 26 U.S.C. §311(a) that a corporation is not to recognize a gain or loss when it distributes stock or property to shareholders. It provides in pertinent part:

(b) Distributions of Appreciated Property. –

(1) In General. – If –

(A) a corporation distributes property ... to a shareholder in a distribution to which subpart A applies, and

(continued...)

7

NIHC was required under federal tax law to recognize a gain to the extent that the market value of the licensing agreement exceeded the book value of the dividend.[11]  In addition, the dividend created a basis in N2HC that was subject to amortization under federal tax law.[12]  Accordingly, Nordstrom was required to report the value of the distribution as a gain by NIHC, as well as the amortization of N2HC's basis, on Nordstrom's consolidated federal tax return for the fiscal year that ended on January 31, 1999.

As indicated above, Nordstrom filed a consolidated federal return with its subsidiaries, including NIHC and N2HC.  Under federal regulations relating to consolidated returns, the gain from the license distributed by NIHC to N2HC was to be deferred over 15 years,[13]

---

[10](...continued)

> (B) the fair market value of such property exceeds its adjusted basis (in the hands of the distributing corporation),
>
> then gain shall be recognized to the distributing corporation as if such property were sold to the distributee at its fair market value.                    ....

[11]In footnotes to its brief, the Comptroller contends that Nordstrom and NIHC made "improper use" of §311(b) and suggests that recognition of the gain at that time was not mandatory under federal law.  We need not resolve these questions of federal tax law to decide this case.

[12]*See* 26 U.S.C. §197.

[13]*See* 26 CFR §1-1502-13.  The 15-year period corresponded to N2HC's amortization of the value of the right to license the trademarks under 26 U.S.C. §197.  This reporting of income and amortization deduction in the consolidated return for the transaction between two affiliates resulted in no income from the transaction for federal purposes.

because the transaction was between affiliated corporations.[14] For example, for tax years 2002 and 2003, Nordstrom's consolidated federal returns reported income to NIHC in the amount of $186,133,333, and a deduction for amortization expense for N2HC in an identical amount.

*NIHC's Maryland Tax Returns*

Under Maryland law, a corporation is subject to tax on income derived from or reasonably attributable to its business activities in Maryland. Maryland Code, Tax-General Article ("TG"), §10-402. Any corporation with Maryland taxable income during a tax year must file an income tax return for that year. TG §10-810. Each member of an affiliated group of corporations is to file a separate income tax return. TG §10-811.

During the relevant years, NIHC and N2HC filed separate income tax returns in Maryland that showed no income apportioned to Maryland from the transactions involving the Nordstrom trademarks. In its Maryland returns for 2002 and 2003, NIHC reported the deferred gain shown on the consolidated federal returns. In particular, NIHC reported Maryland modified income of $186,240,824 and $186,128,851 for 2002 and 2003 respectively, but, as indicated above, did not apportion any of that income to Maryland.[15]

---

[14]Under the tax consultant's "anti-*Geoffrey* strategy," see footnote 4 above, the use of an additional entity (NIHC) was intended to convert the stream of royalty income into a one-time transfer of appreciated property that made its income-shifting purpose less obvious than the strategies used in *Geoffrey* and *SYL*, which involved royalty payments from a parent to a subsidiary holding company.

[15]N2HC's Maryland returns reported Maryland modified income of $18,375,611 and
(continued...)

Although NIHC subsequently took the position before the Tax Court that it had concluded in 2005 that its 2002 and 2003 Maryland returns should not have reported the deferred gain at all, it did not file amended returns for those years.

*Assessment by the Comptroller following Audit of the Maryland Returns*

In September 2006, the Comptroller issued Notices of Assessment against Nordstrom, NIHC, and N2HC, based on the position that income-shifting in the form of trademark royalty expenses had resulted in an underpayment of the companies' Maryland income tax. Nordstrom and its subsidiaries appealed the assessments to the Comptroller's Hearings and Appeals Section, which upheld the assessments in Final Determination Letters issued in May 2007. The total tax assessment against NIHC for 2002 and 2003, including the unpaid tax, interest, and a 25 percent penalty, amounted to $1,949,048; the total tax assessment against N2HC for 2002 and 2003, including unpaid tax, interest, and penalty, amounted to $228,007. In both instances, the assessment was based on the amount of income shifted from Nordstrom to the two subsidiaries through the trademark transactions. An alternative assessment was made against Nordstrom related to the same income; the Comptroller stated that it would not be enforced if the assessments of the subsidiaries were upheld on appeal.

---

[15](...continued)
$33,307,237, respectively for those years, but did not apportion any of that income to Maryland.

*First Visit to Tax Court and Judicial Review*

The companies appealed the assessments to the Maryland Tax Court. The Tax Court conducted a hearing at which it received testimony and documentary evidence concerning the trademark transactions. Pertinent to the issue before us, Greta Sedlock, Nordstrom's former Vice President of Tax, testified concerning the companies' returns for 2002 and 2003 that included the income that was subject of the Comptroller's tax assessment. Ms. Sedlock testified that she would have completed those returns differently based upon a letter she had received from tax authorities in New Jersey in 2005, a state that, like Maryland, requires separate company reporting. She said that she had come to the view that, because NIHC filed separate returns from its affiliated corporations, it should have reported the entire gain from the inter-company transactions on its 1999 Maryland return when the §311(b) gain was recognized. According to Ms. Sedlock, she now believed that deferral of the gain over 15 years was only appropriate for the consolidated returns filed under federal law. She apparently believed that she had made a mistake in how she had reported the NIHC's income on the 1999 and subsequent Maryland returns.

The Tax Court issued its decision in October 2008. It viewed the "dispositive issue" as whether there was a sufficient nexus between the two subsidiaries and Maryland, such that imposition of the State income tax on the income of the subsidiaries would not offend the Commerce Clause or the Due Process Clause of the federal Constitution. It viewed the case

11

primarily as requiring an application of this Court's decision in *Comptroller v. SYL, Inc.*, 375 Md. 78, 825 A.2d 399, *cert. denied*, 540 U.S. 984 *and* 540 U.S. 1090 (2003).

*SYL* concerned two instances where companies subject to the Maryland corporate income tax each created a wholly owned subsidiary in another jurisdiction and transferred intangible assets to that subsidiary. In each case, the parent company then entered into a licensing agreement with the subsidiary under which the parent company paid royalties to the subsidiary for the use of the intangible assets. The parent companies each deducted the royalty payments in computing income subject to the Maryland income tax and, as a result, were able to reduce their tax liability in Maryland. The respective subsidiaries, which had no assets or employees in Maryland, did not file corporate income tax returns in Maryland. 375 Md. at 80-99. In each case, the Court of Appeals held that the subsidiary lacked economic substance as a business entity separate from its parent and also had a substantial nexus with Maryland. Thus, a portion of each subsidiary's income was subject to the Maryland income tax, based on the extent of its parent company's business in Maryland. *Id.* at 106-09.

The "anti-*Geoffrey* strategy" adopted by Nordstrom had attempted to circumvent the rationale ultimately adopted in *SYL* and similar decisions by using several subsidiaries and a series of transactions between the parent corporation and the various subsidiaries. The Tax Court concluded that, while the transactions involving the Nordstrom subsidiaries were more complicated than those in *SYL,* the results were much the same. "Fundamentally, the

12

subsidiaries did not act independently, although the financial structure creates an illusion of substance ... NIHC and N2HC lack real economic substance as separate business entities." Accordingly, the Tax Court held that the activities of the subsidiaries must be considered the activities of Nordstrom, which has a nexus with Maryland. It therefore affirmed the assessments against the two subsidiaries. Because the assessments against the subsidiaries were affirmed, the Tax Court rescinded the alternative assessment against Nordstrom.

NIHC sought judicial review in the Circuit Court for Baltimore County, which rendered a decision in August 2009 based on memoranda submitted by the parties.[16] The Circuit Court noted that the sole issue decided by the Tax Court was whether there was a sufficient nexus between Maryland and NIHC to allow taxation of NIHC's income by Maryland under the federal Constitution. The Circuit Court held that the fact that NIHC lacked economic substance did not by itself resolve the question whether there was a sufficient constitutional nexus between its income and the State to satisfy the federal Constitution. It remanded the case to the Tax Court to address whether there was a

---

[16] N2HC did not seek judicial review of the Tax Court's decision affirming the assessment against it.

The Comptroller sought judicial review of the Tax Court's direction to rescind the alternative assessment against Nordstrom. The Circuit Court later issued an order directing the Tax Court to determine whether Nordstrom had claimed a deduction for any income reported by NIHC. On remand, the Tax Court indicated that it had not found any indication of such a deduction in the record and reiterated its decision to rescind the alternative assessment against Nordstrom. That issue is not before us, as the Comptroller is no longer pursuing the alternative assessment against Nordstrom.

constitutionally sufficient nexus between the §311(b) gain realized by NIHC and business activities in Maryland. If that question were answered in the affirmative, the Circuit Court directed the Tax Court to analyze two additional questions: (1) whether the §311(b) gain constituted taxable income under Maryland tax law; and (2) whether the Maryland requirement of separate entity reporting would prevent taxation of the deferred §311(b) gain in the 2002 and 2003 tax years.

*Second Visit to Tax Court and Judicial Review*

In July 2010, the Tax Court again upheld the assessment against NIHC and issued an Amended Memorandum of the grounds for its decision. The Tax Court held that Maryland's taxation of the reported income was constitutional as it was not possible to separate the value of the trademarks, their licensing, and the gain recognized by NIHC from Nordstrom's business activities in Maryland. The Tax Court stated that "but for the activities of Nordstrom and its use of the trademarks in Maryland, the gain of NIHC would not have been recognized. Nordstrom's business activities and the use of the intellectual property rights obtained through its agreement with N2HC produced the gain income reported by NIHC." In addition, the Tax Court held that, because Nordstrom's nexus was attributed to NIHC, the income was taxable under Maryland law. Finally, the Tax Court concluded that Maryland's requirement of separate entity income tax returns did not prohibit the taxing of the §311(b) gain "when the income is attributed to the activity of the parent Nordstrom and its use of the

14

marks in Maryland for the subject years." The Tax Court stated: "NIHC reported the deferred gains as Maryland modified income and the substance of the transaction does not prevent the taxing of income earned in the assessment years because of separate reporting requirements."

NIHC again sought judicial review of the Tax Court decision. In December 2011, the Circuit Court affirmed in part and reversed in part the Tax Court decision. The court agreed with the Tax Court that "the §311(b) gain was the result, in part, of the projected use of the trademarks in Maryland" and that, therefore, there was substantial evidence of a sufficient nexus of the reported income with Maryland. It also concluded that the gain income was "reasonably attributable" to activities in Maryland and therefore taxable under the Maryland income tax law, as that law had been construed to allow taxation "to the bounds permitted by the Constitution."[17] However, the court concluded that Maryland's separate reporting requirement prohibited the Comptroller from assessing the deferred gain reported by NIHC for 2002 and 2003, which the court believed should have been reported with the rest of the gain when it was recognized in 1999. The court therefore reversed the assessment against NIHC.

---

[17] *Hercules, Inc. v. Comptroller*, 351 Md. 101, 110, 716 A.2d 276 (1998).

*Court of Special Appeals Decision*

The Comptroller appealed the Circuit Court decision to the Court of Special Appeals. NIHC did not cross-appeal. In an unreported decision, the Court of Special Appeals reversed the Circuit Court judgment. The intermediate appellate court noted that the only issue before it was whether Maryland's separate reporting requirement prevented the taxation of the gain reported on NIHC's 2002 and 2003 returns. The Court of Special Appeals stated that the Circuit Court had incorrectly focused on how the §311(b) gain should have been reported instead of whether it was taxable in the way it had in fact been reported.[18] The court noted

[18]The Court of Special Appeals explained:

> The Tax Court concluded that Maryland's separate entity reporting requirement did not preclude Maryland's taxing of the §311(b) deferred gain as reported by NIHC on its 2002 and 2003 Maryland tax returns. The circuit court, however, did not address this issue in its review of the Tax Court's decision. Instead, the circuit court focused on the proper way in which the §311(b) gain should be reported, given the conflict between the IRS regulations governing consolidated federal returns (which require the recognition of the gain on a deferred basis over fifteen (15) years), and the Maryland requirement of separate entity returns (which may require the recognition of the gain in its entirety, in the year that the gain was realized). Thus, in the instant case, the circuit court held "*[i]f* the rules relating to deferral of gain on the federal consolidated return were disregarded and *[if]* NIHC reconstructed its federal taxable income *as if* it filed a separate federal income tax return, the §311(b) gain *would not have been reported* in 2002 and 2003."
>
> What NIHC should (or should not) have done in the instant case is not determinative of the issue presented in this appeal. The

(continued...)

16

that it had not been presented with any law or other authority "that precludes Maryland from taxing income that is constitutionally taxable by Maryland and that is reported by the corporate taxpayer as Maryland modified income on its Maryland income tax return." The Court of Special Appeals found no error in the Tax Court's decision to uphold the assessment against NIHC. Accordingly, it reversed the Circuit Court decision.

The Court of Special Appeals stated that it was expressing no opinion on "the broader issue of whether a corporation's §311(b) gain, which is constitutionally subject to taxation by Maryland, is reportable as Maryland modified income on a deferred basis under Maryland's requirement of separate entity income tax returns, where such deferred gain is reported on the corporation's consolidated federal income tax return."

*Petition for Certiorari*

NIHC sought a writ of certiorari, which we granted to review the merits of the Tax Court's amended decision in this case.

_____

[18](...continued)
> key is what NHIC did, in fact, do. The uncontradicted evidence before the Tax Court was that NIHC reported the §311(b) deferred gain as Maryland modified income in its 2002 and 2003 Maryland tax returns. In other words, whether the deferred §311(b) gain should or should not have been reported for the tax years of 2002 and 2003 has been rendered moot by the fact that NIHC reported such gain on its 2002 and 2003 Maryland tax returns.

**Discussion**

*Standard of Review*

As the Tax Court is an adjudicative administrative body of the executive branch, its decisions are subject to the same standards of judicial review as adjudicatory decisions of other administrative agencies. *Gore Enterprise Holdings, Inc. v. Comptroller,* 437 Md. 492, 503, 87 A.3d 1263 (2014); *see* TG §13-532(a)(1). A reviewing court may uphold a Tax Court decision only on the findings and reasons given by the Tax Court. *Gore Enterprise*, 437 Md. at 503. Findings of fact are reviewed on a deferential "substantial evidence" standard – *i.e.*, whether the record contains evidence that reasonably supports the agency's conclusion. *Id*. at 504. A reviewing court also accords great weight to the Tax Court's interpretation of the tax laws, but reviews its application of case law without special deference. *Id*. at 504-5.

*Deciding What Question is Before Us*

Before we can venture an answer to the question before us, we must decide what that question is. As is sometimes the case in appellate litigation, the parties' briefs debate the wording, number, and nature of the question(s) presented.[19] Regardless of the preferred

---

[19]For example, NIHC contends that the Court of Special Appeals incorrectly rephrased the question raised by the Comptroller, and exceeded the limits of judicial review by basing its decision on a ground not addressed by the Tax Court. The Comptroller argues otherwise and asserts that, even if we address the question preferred by NIHC, the outcome of this appeal is no different. The Comptroller also notes that, while NIHC presented three questions in its petition for certiorari, it has included four questions in its brief, two of which

(continued...)

18

wording of the parties, the issues before us are constrained by the facts found and the legal conclusions drawn in the decision of Tax Court under review, and by the issues preserved by the parties in seeking review of that decision in the courts below.

The present case involves judicial review of a decision of the Tax Court pursuant to TG §13-532. In that context, it is often said that we "look through" the decision of the Court of Special Appeals and the Circuit Court to review directly the agency decision. *See Frey v. Comptroller*, 422 Md. 111, 136-37, 29 A.3d 475 (2011). Thus, our review focuses on the issues addressed by the Tax Court and its reasoning. As indicated above, our review is also limited in another way. As a general rule, we address only issues that have been preserved for review.

In its amended decision, the Tax Court determined that the §311(b) gain recognized by NIHC had a nexus with Maryland through Nordstrom's business activities in Maryland during the pertinent years and was subject to Maryland income taxation for those tax years. The Circuit Court affirmed those holdings. NIHC did not cross appeal as to those issues.[20]

---

[19](...continued)
did not appear in its certiorari petition. NIHC responds that the two questions were subsumed in one of the questions it originally presented. We need not referee this debate to identify the question before us.

[20]If we were to address those issues, we would have little trouble coming to the same conclusions as the Tax Court and the Circuit Court. As recounted above, the record demonstrates that the corporate structure and inter-company transactions were designed to shift income away from states like Maryland through the use of entities that, as the Tax Court found, had no economic substance as business entities apart from Nordstrom. Indeed, the consulting firm that designed the transactions for Nordstrom labeled it the "anti-*Geoffrey*

(continued...)

Thus, in the posture of the case before us, there is no question that the income reported on NIHC's Maryland returns for 2002 and 2003 related to Nordstrom's business activities in Maryland during those years and that a portion of that income was subject to taxation in Maryland. A third issue addressed by the Tax Court, at the direction of the Circuit Court, was whether the Maryland statutory requirement that corporate affiliates file separate returns prohibited the Comptroller from taxing the portion of that gain reported on NIHC's 2002 and 2003 returns. The Circuit Court reversed the Tax Court decision on that ground, the Comptroller sought review of only that part of the Circuit Court's decision in its appeal to the Court of Special Appeals, and, following reversal of that issue in the intermediate appellate court, NIHC requested our review of the issue. That is the only portion of the Tax Court decision that has been preserved for review.

*Deciding the Question Before Us*

The critical holding of the Tax Court appears near the end of its amended decision. After recounting its prior findings and conclusions, including that a portion of NIHC's gain – equivalent to the deferred gain on the federal tax return – had been reported on the

_____

[20](...continued)
strategy." See footnote 4 above. This strategy, although more convoluted than the scheme devised in the *Geoffrey* case, also relied on transactions with subsidiaries without economic substance separate from the parent corporation to argue that income lacked a nexus with the taxing state. *See also Gore Enterprise Holdings, Inc. v. Comptroller*, 437 Md. 492, 87 A.3d 1263 (2014) (holding that nexus for taxation by Maryland existed when two corporate subsidiaries created to hold intangible assets of the parent corporation lacked economic substance as separate entities).

pertinent Maryland tax returns, the Tax Court addressed whether the Maryland requirement that related corporations file separate tax returns would prohibit taxation of that income. It stated:

> ...The Court finds that there is no such prohibition when the income is attributed to the activity of the parent Nordstrom and its use of the marks in Maryland for the subject years. NIHC reported the deferred gains as Maryland modified income and the substance of the transaction does not prevent the taxing of income earned in the assessment years because of separate reporting requirements.

The Court of Special Appeals reached the same conclusion on the facts of this case,[21] although it explicitly declined to decide the more abstract question of whether a corporation's §311(b) gain is required to be reported as Maryland modified income on a deferred basis on separate Maryland returns when it is reported on a deferred basis on a consolidated federal return. In limiting its holding in that manner, the intermediate appellate court wisely adhered to a maxim of judicial decision-making that counsels against addressing questions abstracted from the facts before the court. *Garner v. Archers Glen Partners Inc*., 405 Md. 43, 46, 949 A.2d 639 (2008) ("an appellate court should use great caution in exercising its discretion to comment gratuitously on issues beyond those necessary to be decided").

---

[21] In arguing that the intermediate appellate court decided a "different question" from the abstract question it favors, NIHC focuses on the first sentence of the excerpt of the Tax Court decision quoted above, discounts the second sentence which referred to NIHC's reporting of the deferred gain on its 2002 and 2003 returns, and ignores the context of that paragraph in the rest of the Amended Memorandum of Grounds for Decision.

The separate reporting requirement is set forth in TG §10-811, which provides simply that "[e]ach member of an affiliated group of corporations shall file a separate income tax return." A regulation adopted by the Comptroller elaborates that "each separate corporation shall report its taxable income without regard to any consolidation for federal income tax purposes." COMAR 03.04.03.03B(1). The regulations further provide:

> Use of Federal Figures. The starting point for the Maryland return is the taxable income as defined in the Internal Revenue Code and developed on the federal return. Corporations included in a consolidated filing for federal purposes shall file separate Maryland returns and compute separate taxable income.

COMAR 03.04.03.05B. Neither the statute nor the corresponding regulations explicitly address the treatment of §311(b) deferred gain, much less its treatment in the context of a subsidiary corporation that lacks economic substance apart from its parent.

We agree with the Court of Special Appeals that the Tax Court's determination that Maryland's separate reporting requirement for corporations did not prohibit the Comptroller's assessment taxing NIHC's §311(b) gain on a deferred basis should be upheld on judicial review. We start from the premise that the Comptroller's assessment of a tax is presumed to be correct. TG §13-411. The burden is on the taxpayer to show that the assessment is wrong. *Fairchild Hiller Corp. v. Supervisor of Assessments*, 267 Md. 519, 523, 298 A.2d 148 (1973); TG §13-528(b). In computing the assessment, the Comptroller used the figures for Maryland taxable income reported on NIHC's Maryland returns, which correlated with the figures for its federal taxable income reported on NIHC's federal returns

22

for those years – the "starting point" for computation of its tax liability. The Tax Court found that the ongoing activities of Nordstrom in Maryland, including during the 2002 and 2003 tax years, were responsible for the §311(b) gain reported on NIHC's Maryland tax returns for those years[22] and that NIHC lacked any economic substance apart from Nordstrom.

During the course of this case, NIHC has suggested that the Comptroller should have reached that income in other ways,[23] its preferred method – an application of the separate reporting requirement – being conveniently outside the period of limitations. NIHC argues that Nordstrom should have re-computed a separate federal return for each of the affiliated companies for each of the years in question – called a "pro forma" federal return – and based its Maryland return for each year on the income shown on the corresponding pro forma federal return. NIHC argues that its pro forma federal returns – and thus its Maryland return as well – would have reported the entire §311(b) gain as income in 1999 and that NIHC

_____

[22]It is incontrovertible that the §311(b) gain was derived from the value of the licensing agreement that NIHC transferred as a dividend to N2HC. The value of the licensing agreement ultimately depends on Nordstrom's commercial activities using those trademarks, part of which occur in Maryland. In sum, there is no question at this juncture that the §311(b) gain is related to activities in Maryland, and that a properly apportioned share of it is taxable by Maryland.

[23]In addition to arguing the NIHC's §311(b) gain should have been assessed as to NIHC's 1999 return, which would have been in advance of the Nordstrom business activities that provided the nexus to Maryland, NIHC's counsel also suggested in the Circuit Court that the Comptroller should have disregarded the amortization deduction of N2HC rather than tax the deferred §311(b) gain actually reported by NIHC. As noted above, the annual amount of the N2HC amortization deduction was identical to the annual amount of the deferred §311(b) gain of NIHC assessed by the Comptroller.

23

should have reported no income from that gain on its pro forma federal returns and Maryland returns for 2002 and 2003. But NIHC never completed any pro forma federal returns, did not amend its Maryland returns in that manner, and, based on the record in this case, did not embrace this manner of reporting its income until tax was assessed by the Comptroller, even though the corporate official in charge of its tax returns claimed to have come to a different conclusion as to how to report its income within the period for amending the returns.

As the Court of Special Appeals held, whether NIHC could have, or should have, reported the entire gain as income subject to Maryland income tax in 1999 – in advance of the business activities of Nordstrom in Maryland in 2002 and 2003 that established the nexus with the income shifted to NIHC– is a separate question from whether the Comptroller could assess income actually reported by NIHC for those years. NIHC complains that the Court of Special Appeals in effect held that it was "bound" by the returns it had filed that it now says were mistaken. It would seem more accurate to say that it is bound by the record in this case.

The separate reporting requirement does not contradict any of the key facts on which the Comptroller's assessment was based:

- the taxpayer lacked economic substance apart from its parent corporation

- the income recognized by the taxpayer was related to the business activities of its parent

- the parent corporation conducted business activities in Maryland during the tax years in question

24

- the taxpayer reported a portion of the income related to its parent's activities on its Maryland tax returns

- that income was not otherwise taxed by Maryland

- the taxpayer never filed amended returns nor did it submit pro forma federal returns adopting a different method of reporting that income, although it became aware of a different method of filing within the period of limitations

There is no question at this juncture that the transactions carried out under the "anti-*Geoffrey* strategy" shifted income related to Nordstrom's activities in Maryland to NIHC. In essence, NIHC argues that requirement of separate reporting in TG §10-811, together with the statute of limitations, negates the fact that it actually reported part of the income for the tax years in which Nordstrom had business activity in Maryland and absolves it of that tax liability altogether. While the failed anti-*Geoffrey* strategy was an effort to shift income beyond the geographical reach of a state tax collector, NIHC's current argument seeks to shift income to a time period beyond the reach of a state tax collector. It may be that appellate judges are not well-versed in concepts that bend time and space, but we believe this argument is without merit on the facts of this case.

### Conclusion

There is no question that the income related to Nordstrom's activities in Maryland during 2002 and 2003 tax years was shifted in part to NIHC. The Comptroller assessed tax on that income as NIHC reported it on its tax returns for those years. However, neither NIHC nor its affiliated corporations has amended their returns to reflect another way of

25

reporting that income. Essentially, NIHC asks that, because it mistakenly neglected to report its entire gain and pay the appropriate tax on its 1999 Maryland return, it should be forgiven any tax liability on that income, even though it reported a portion of that income on its 2002 and 2003 returns. On the facts of this case, the separate reporting requirement does not eliminate the tax liability for the income reported, properly subject to tax, and not previously taxed. We hold that, on the record before the Tax Court, NIHC did not carry its burden of showing that the Comptroller's assessment was wrong.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**