10 N.Y.3d 392 (2008)
888 N.E.2d 1029
859 N.Y.S.2d 87
In the Matter of DISNEY ENTERPRISES, INC., et al., Appellants,
v.
TAX APPEALS TRIBUNAL OF THE STATE OF NEW YORK et al., Respondents.
Court of Appeals of the State of New York.
Argued February 13, 2008.
Decided March 25, 2008.
*393 Morrison & Foerster LLP, New York City (Paul H. Frankel, Craig B. Fields and Roberta Moseley Nero of counsel), Michael H. Salama, Burbank, California, and Brandee A. Tilman for appellants.
*394 Andrew M. Cuomo, Attorney General, Albany (Robert M. Goldfarb, Barbara D. Underwood and Andrew D. Bing of counsel), for Commissioner of Taxation and Finance, respondent.
*410 Judges CIPARICK, GRAFFEO, READ, PIGOTT and JONES concur with Chief Judge KAYE; Judge SMITH concurs in result in a separate opinion.

OPINION OF THE COURT
Chief Judge KAYE.
This appeal tests the validity, under federal law, of New York's franchise tax apportionment formula.
Petitioner, Disney Enterprises, Inc., is a worldwide entertainment conglomerate with hundreds of parents, subsidiaries and affiliates. Disney conducts general operations in three interrelated business segments pertinent to the present appeal: theme parks and resorts, filmed entertainment and consumer products. Its consumer products segment licenses and distributes merchandise (apparel, toys, gifts, housewares) and publications (books, magazines, comic books). It also licenses its properties for promotional use to, for example, soft drink companies and fast food chains. Disney receives royalties from these licensing activities, both tangible (from manufactured products) and intangible (from copyrights). Through its Synergy Group, Disney *395 coordinates the three business segments for cross-promotional purposes, parlaying the success of a movie or Broadway show (such as "The Little Mermaid") into sales of its licensed products. These cross-promotional activities (or synergies) create flows of value among Disney's interrelated corporate subsidiaries and affiliates.
For corporate franchise tax purposes, New York permits or requires[1] related corporations to report their income on a "combined basis" where "there are substantial intercorporate transactions among the corporations" (see 20 NYCRR 6-2.3 [a]), on the theory that if the members of the group filed separately the financial activities of the group as a whole would be distorted. Combined reporting treats the unitary business as a single, taxable entity, thus the net income of the combined group forms the basis for calculation of the percentage of income taxable by the state. To determine the portion of net income that can be allocated to the state, New York uses an apportionment formula that multiplies the taxpayer's combined worldwide business income by a business allocation percentage (BAP) based upon the New York percentages of the group's overall property, receipts and payroll (Tax Law § 210 [3] [a]). The three percentages are then added together, divided by the number of percentages overall[2] (Tax Law § 210 [4]) and multiplied by the tax rate. A taxpayer calculates the receipts factorthe focus of this appealby:
"(2) ascertaining the percentage which the receipts of the taxpayer, computed on the cash or accrual basis according to the method of accounting used in the computation of its entire net income, arising during such period from
"(A) sales of its tangible personal property where shipments are made to points within this state, ...
"(D) all other business receipts earned within the state, bear to the total amount of the taxpayer's receipts, similarly computed, arising during such period from all sales of its tangible personal property, *396 services, rentals, royalties, ... and all other business transactions, whether within or without the state" (Tax Law § 210 [3] [a]).
Thus, the New York percentage is calculated by computing the combined New York totals for the factor (the numerator) and dividing them by the worldwide totals (the denominator).
During relevant years, Disney filed combined reports for certain of its corporate subsidiaries, including Buena Vista Home Video (Video), the subject of the present litigation. For tax years 1990, 1991 and 1992, Video filed separately from the combined group.[3] Although it had $662,038,872 in gross receipts in 1990 and large sales shipped to points within New York State, Video reported a fixed dollar minimum tax due of $1,500 and a New York allocation of 0%. It reported the same minimum tax due and 0% New York allocation for years 1991, when it had $989,510,226 in gross receipts, and 1992, when it had $1,372,034,743 in gross receipts.
For tax year 1993, Disney sought permission to add certain subsidiaries to its combined report, among them Video, stating that the company believed that distortion of the current combined group's activities was present due to the benefits of the "Disney synergy," permeating "virtually all of the inextricably connected entities"including the proposed additionsand creating substantial value that could not be objectively quantified for each of the associated companies. In support of its request, Disney listed six examples of unitary activities that originated from the motion picture "Beauty and the Beast." Animation for the feature was done at its Disney-MGM Studios theme park facilities. Buena Vista Pictures, its distribution company, handled development of theatrical and television advertising trailers and joint advertising arrangements with promotional partners such as Burger King. The Disney Channel televised "Be Our Guest: The Making of Beauty and the Beast," while Buena Vista Television issued a special featuring Angela Lansbury singing "Beauty and the Beast." Video released the home video "The Jungle Book," which included a trailer segment from "Be Our Guest: The Making of Beauty and the Beast," and later released the home video of "Beauty and the Beast."
The Division granted Disney's request, and in 1993-1995 Video was included in the Disney group's combined report. *397 Video, however, continued to report a fixed dollar minimum tax of $1,500 and a 0% New York allocation percentage, and reported none of its $1,450,727,704 in gross receipts for 1993, its $1,802,840,975 in gross receipts for 1994 or its $2,456,596,414 in gross receipts for 1995 as "sales of tangible personal property shipped to points within New York State," although, again, Video had large receipts from property shipped to points within the state (Video's New York payroll and property factor calculations were negligible).
In omitting Video's destination sales in New York from its combined receipts calculation, Disney relied on a federal exemption that shielded Video, it claimed, from New York franchise income taxation other than for the fixed $1,500 minimum. Section 101 of Public Law 86-272 (73 US Stat 555) provides:
"(a) No State, or political subdivision thereof, shall have power to impose, for any taxable year ending after [September 14, 1959], a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:
"(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and
"(2) the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1) ...
"(c) For purposes of subsection (a) of this section, a person shall not be considered to have engaged in business activities within a State during any taxable year merely by reason of sales in such State, or the *398 solicitation of orders for sales in such State" (codified as 15 USC § 381 [a], [c]).[4]
After audit, the New York State Department of Taxation and Finance adjusted Disney's business allocation percentage for years 1990-1995 to reflect the companies that were included in or should have been included in the combined group. It increased the numerators in each year's receipts factors, representing combined New York destination sales, to include Video's destination sales for tax years 1990-1995. By letter dated October 5, 2000, the Division of Taxation advised Disney that its audit had resulted in an increase of tax liability in the amount of $1,349,640.
Disney claimed that Video was not subject to taxation under Tax Law article 9-A because its New York activities did not amount to more than "solicitation." Video's sole New York activities, it maintained, were the sale of movie cassettes to third partieslarge-scale retailers such as Wal-Mart, Toys R Us and Blockbusterfor purposes of resale, and to wholesalers. Although other Disney entities such as the Disney Store promoted Video's products in, for example, "cash-wrap displays" at cashier's counters, Video itself only permitted salespeople to solicit business from New York customers, not to take orders, collect money or accept returned items, and Video did not own or rent any property in New York. When it was included as a member of the combined group, therefore, Disney determined that Video's New York receipts could not be counted in tabulating the combined receipts factor under New York's franchise tax apportionment formula as Video was a nontaxpayer pursuant to Public Law 86-272.
On November 30, 2000, the Department of Taxation and Finance issued a notice of deficiency asserting total taxes due for the six years at issue, plus interest, of $1,359,659.42. On Disney's petition to the Division of Tax Appeals, the administrative law judge sustained the notice, finding that "[i]t simply cannot be concluded that the only business activit[y] within New York ... by or on behalf of [Video] was the solicitation of orders for sales of tangible personal property." To hold otherwise would be to ignore the "inextricable relationship to petitioner's unitary business" and the "extraordinary synergies" among members of the combined Disney group involved in the retailing *399 of consumer products. The Tax Appeals Tribunal affirmed, emphasizing that as "[t]he BAP ... determines the tax liability of the combined group's taxpayer members," inclusion of the sales in the combined group's numerator did not violate Public Law 86-272. The Appellate Division confirmed the determination of the Tax Appeals Tribunal and dismissed the petition. We now affirm.

Analysis
A. Is the Formula as Applied to the Combined Group Imposition of a Tax on Video?
As a threshold issue, we must determine whether the Department of Taxation and Finance's inclusion of Video's income in its apportionment formula when determining the combined group's taxable New York income is, in fact, a tax. We agree with the Appellate Division that by "including Video's New York sales receipts in the numerator of the business allocation percentage, the Department is not imposing a tax upon Video. It is attempting to best measure the combined group's taxable in-state activities" (Matter of Disney Enters., Inc. v Tax Appeals Trib. of State of N.Y., 40 AD3d 49, 52 [2007]).
A state may require combined reporting when there is a "unitary business," or a group of companies benefitting from "functional integration, centralization of management, and economies of scale" (Container Corp. of America v Franchise Tax Bd., 463 US 159, 179 [1983], quoting F. W. Woolworth Co. v Taxation & Revenue Dept. of N.M., 458 US 354, 364 [1982]). New York employs combined reporting to "avoid distortion of and more realistically portray the true income of closely related businesses" (Matter of Standard Mfg. Co. v Tax Commn. of State of N.Y., 114 AD2d 138, 140 [3d Dept 1986], affd for reasons stated 69 NY2d 635 [1986]) regardless of where they are geographically situated. A combined group may include a corporation not individually subject to tax where it is "necessary to properly reflect the tax liability of one or more taxpayers included in the group" due to "substantial intercorporate transactions" or "some agreement, understanding, arrangement or transaction whereby the activity, business, income or capital of any taxpayer is improperly or inaccurately reflected" (see 20 NYCRR 6-2.5 [a]; Tax Law § 211 [4]).
Once this tax base is determined, an apportionment formula is used to allocate the correct geographical, or in-state percentage of income attributable to the group, by "applying the apportionment *400 factors of the entire unitary business to the taxable net income of the unitary business" (1 Hellerstein and Hellerstein, State Taxation ¶ 8.11 [1] [Warren, Gorham & Lamont, 3d ed 2007] [hereinafter State Taxation]). New York, during the tax years at issue, used a weighted three-factor apportionment formula to determine what portion of a taxpayer's income was attributable to in-state business. After apportioning the unitary group's income pursuant to this formula, the Division attributed the apportioned New York income (including the income of the nontaxable members) to the taxable members of the group. Thus, no New York income or New York tax was attributed to or imposed on a nontaxpayer (see State Taxation ¶ 9.18 [1] [a] [ii]).
It is well settled that, when apportioning a group's in-state taxable income, a state may look beyond its borders and take into account income of companies not subject to its jurisdiction (see Barclays Bank PLC v Franchise Tax Bd. of Cal., 512 US 298, 311-312 n 10 [1994] [finding nothing to suggest that in approximating taxpayers' income, California may not "reference the income of corporations worldwide with whom those taxpayers are closely intertwined"]; Container Corp., 463 US at 165). In doing so, the state is not deemed to have taxed that income but instead to have used it to determine the tax base fairly attributable to the group as a whole (see Shell Oil Co. v Iowa Dept. of Revenue, 488 US 19, 30 [1988] [noting that "income that is included in the preapportionment tax base is not, by virtue of that inclusion, taxed by the State"]).
Acknowledging this authority, Disney maintains that the inclusion of Video's sales in the numerator of the apportionment formulaas opposed to the denominator or the multiplieris the key to its invalidity, and amounts to imposition of a tax on Video. As the Shell Oil Court said, "the function of an apportionment formula is to determine the portion of a unitary business' income that can be fairly attributed to [the company's] in-state activities" (id. at 31). The New York Department of Taxation and Finance appears to have done precisely that.
Clearly, including Video's income in that of the combined group in the numeratorthe part of the equation that, in relation to worldwide sales, forms the basis for the unitary group's New York taxationincreases the Disney group's overall New York tax liability. This does not, however, make it a tax on Video. This Court has recognized the distinction between inclusion of nontaxable income in a formula used as a basis for imposition of *401 tax and the tax itself (see Brady v State of New York, 80 NY2d 596, 604 [1992] ["(w)hen the State levies taxes within its authority, `property not itself taxable can be used as a measure of the tax imposed'" without amounting to a tax on the foreign property]).
The United States Supreme Court also has recognized the distinction (see Maxwell v Bugbee, 250 US 525, 535 [1919] [tax was imposed only upon New Jersey property although apportionment formula considered ratio between nonresident's in-state property and entire estate]; Great Atlantic & Pacific Tea Co. v Grosjean, 301 US 412, 425 [1937] [state tax classification that considered "advantages and capacities" of company's membership in larger multi-state chain "is not in legal effect the taxation of property or privileges possessed or enjoyed by the taxpayer beyond the borders of the state"]). Shell Oil does not hold otherwise especially where, as here, the income is reasonably attributable to New York (see Moorman Mfg. Co. v Bair, 437 US 267, 269 [1978]).[5]
Indeed, the conceptual basis for combined reporting supportsvirtually requiresa distinction between tax apportionment formulas and taxation. The purpose of unitary reporting is to reflect the economic reality of the group as a whole, taking into account multi-jurisdictional, often worldwide, economic activity. Unitary reporting was intended to relieve taxpayers from accounting methods that failed to account for overlap in flows of value, and substitute methods capable of accommodating reciprocities. As Justice Brennan explained:
"The unitary business/formula apportionment method is a very different approach to the problem of taxing businesses operating in more than one jurisdiction. It rejects geographical or transactional accounting, and instead calculates the local tax base by first defining the scope of the `unitary business' *402 of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that `unitary business' between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction" (Container Corp., 463 US at 165 [1983]).
If there exist synergies between companies to such a degree that individual corporate receipts cannot be reported without distortion, then the group is conceptually a unified entity with regard to calculating its taxable New York income. As such, it would be unrealistic to require combined group reporting for purposes of achieving economic reality and then parse out individual company receipts when apportioning taxable income. How could the Department of Taxation and Finance determine how much, if any, of Video's New York income from "Beauty and the Beast" should be ascribed to MGM Studios, the animators, to Buena Vista Pictures, marketers and distributors, or to Buena Vista Television, one of its promoters? Certainly, each group member accounts for its own receipts; combined reporting was not instituted because of corporate inability to tabulate individual sales, but because of the distortionoften to the detriment of the taxpayer, such as the situation herethat resulted from separate taxation on such sales. The Disney combined group's tax would be equally distorted were it to disregard the millions of dollars in Video's New York destination sales achieved through the group's cross-promotional activities.
Therefore, with regard to Disney's combined activities during the relevant tax period, the evaluation of which falls under the Tribunal's special expertise, we defer to its determination that "inclusion of [Video's] sales in the numerator of the receipts factor is necessary to arrive at the appropriate business allocation percentage" (see Matter of Industrial Liaison Comm. of Niagara Falls Area Chamber of Commerce v Williams, 72 NY2d 137, 144 [1988]) and does not amount to a tax on Video.

B. The Impact of Public Law 86-272
While concluding that the apportionment formula represented not a tax on Video but a reflection of Disney's economic reality, the Appellate Division additionally found no violation of Public Law 86-272 on the ground that the New York activities of members of the unitary group fall within the "on behalf of" language of the statute (Matter of Disney, 40 AD3d at 53). We *403 conclude, one step earlier, that the "person" referred to in Public Law 86-272 is Disney, not Video, and we do not reach the "on behalf of" language of the statute.
We begin our reading of Public Law 86-272 with the "presumption that Congress does not intend to supplant state law" (Balbuena v IDR Realty LLC, 6 NY3d 338, 356 [2006]). Where a federal law treads on a traditional state power, this presumption is especially strong, and is overcome only where the statute evidences that pre-emption is "the clear and manifest purpose of Congress" (New York State Conference of Blue Cross & Blue Shield Plans v Travelers Ins. Co., 514 US 645, 655 [1995], quoting Rice v Santa Fe Elevator Corp., 331 US 218, 230 [1947]). As this Court has long held that the power to tax is such a traditional state power (see People v Adirondack Ry. Co., 160 NY 225 [1899]), we will not, "absent unambiguous evidence, infer a scope of pre-emption beyond that which clearly is mandated by Congress' language" (Cipollone v Liggett Group, Inc., 505 US 504, 533 [1992]).
Section 101 (a) of Public Law 86-272 provides that "[n]o State. . . shall have power to impose . . . a net income tax on the income derived within such State" if "the only business activities within such State by or on behalf of such person during such taxable year are . . . the solicitation of orders." The statute, therefore, creates a tax exemption for a "person" whose in-state activities do not exceed solicitation. A "person" is defined to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals" (1 USC § 1; S Rep 86-658, 86th Cong, 1st Sess, reprinted in 1959 US Code Cong & Admin News, at 2548). As such, it is reasonable to conclude that the unitary group, not Video alone, is a "person" for purposes of the statute (see Airborne Nav. Corp. v Arizona Dept. of Revenue, 1987 Ariz Tax LEXIS 34, *6 [Bd of Tax App]). This approach is consistent with the concept of unitary reporting in considering the group to be "one entity" for franchise income taxation. No authority persuades us otherwise.
Legislative history surrounding Public Law 86-272 sheds no light on the intended scope of the word "person" to describe the relevant entity, or what activities "on behalf of" a related company would take the latter outside of the exemption. It does, however, make clear that the statute should be read narrowly.
The statute was enacted in 1959nearly half a century agoin response to the Supreme Court's holding in Northwestern *404 States Portland Cement Co. v Minnesota that "net income from the interstate operations of a foreign corporation may be subjected to state taxation provided ... [it] is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same" (358 US 450, 452 [1959]). The "rather limited" purpose of Public Law 86-272 was to set a "lower limit" on state taxation (Heublein, Inc. v South Carolina Tax Comm'n, 409 US 275, 279, 280 [1972]), to establish a "`minimum standard' for imposition of state net-income tax based on solicitation of interstate sales" (Wisconsin Dept. of Revenue v William Wrigley, Jr., Co., 505 US 214, 222 [1992]). Congressional concern was for small- and medium-sized businesses that might have to file a return in every state where they solicited a sales order. In the words of the House Report on the proposed bill:
"compliance with the diverse tax laws of every jurisdiction in which income is produced will require the maintenance of records for each jurisdiction and the retention of legal counsel and accountants who are familiar with the tax practice of each jurisdiction. This will mean increases in overhead charges, in some cases to an extent that will make it uneconomical for a small business to sell at all in areas where volume is small" (HR Rep 936, 86th Cong, 1st Sess; see Matter of Gillette Co. v State Tax Commn., 56 AD2d 475, 481 [3d Dept 1977], affd 45 NY2d 846 [1978]).
Congressman William E. Miller (New York) explained:
"[T]his legislation is not broad in its effect. It is very narrow, indeed. It covers only the single and simple area where a corporation does nothing more within a State than solicit orders. . . . This is important to small business. Large corporations can afford the attorneys and the accountants necessary to keep books for the payment of some 34 different State taxes computed on 34 different State taxing provisions. But, small business engaged in interstate commerce who do nothing more, perhaps than solicit orders either by a salesman within a State or even just through the mail, have always thought that they would not be subject to multiple State taxation" (105 Cong Rec 17771 [1959]).
Both formula apportionment schemes and unitary reporting existed at the time the statute was enacted (see e.g. L 1944, ch *405 415), and nothing in the bill's history suggests that Congress intended to alter the use or applicability of these methods. In fact, the bill was originally intended as a temporary, or stopgap, measure until congressional committees were able to study the "entire problem of state taxation of interstate commerce" (Heublein, 409 US at 281; see 1959 US Code Cong & Admin News, at 2559). Congress, however, has declined to further address the question since the statute was enacted, notwithstanding the struggles the provision generated in California, as the following discussion reflects.
Disney's synergies date back to the earliest years of the company, in the 1920s. The company itself says that it continues to expand its market segments, comprised of "integrated, well-connected businesses that operate in concert to maximize exposure and growth worldwide." This is a far cry from the limited objective of Public Law 86-272. We cannot agree that the statute was intended to prevent inclusion of New York income generated by the unified activities of this corporate giant in the state's franchise tax apportionment scheme.

C. The California Experience
In reaching our conclusions, we have considered the helpful insights of the California tax courts, which, along with that state's Court of Appeal, have conducted the most thorough analysis of this issue (albeit in large part with relation to application of California's "throwback" rule,[6] which we do not have in New York). Although ultimately deciding to prohibit inclusion of income such as Video's in the numerator of apportionment formulas with respect to combined groups, California did so as a matter of tax policy, finding no "legal flaws" in either formula.
In 1966, the California State Board of Equalization (SBE) adopted what is now referred to as the "Joyce rule." The activities of U.S. Shoe, a company that had acquired Joyce, Inc., were limited to visits by sales representatives who solicited but did *406 not accept orders from merchants (Matter of Joyce, Inc., 1966 Cal Tax LEXIS 18, *2-3). The California Franchise Tax Board deemed that Joyce and Shoe were engaged in a unitary business and combined the two companies' income for apportionment purposes. The SBE held that pursuant to Public Law 86-272 "no state has the power to impose a tax on or measured by income derived within the state by any person if the only business activities within the state are the solicitation of orders for sales," thus "the net income of U.S. Shoe derived from sources within this state was not includible" in the formula (id. at *9, 10).
In 1988, the California SBE changed course. In Matter of Finnigan Corp. (1988 Cal Tax LEXIS 28), it adopted what is now referred to as the "Finnigan rule." California's "throw back" rule, modeled after a Uniform Division of Income for Tax Purposes Act (UDITPA) provision, required that sales not taxable in the state of the destination of the goods by operation of Public Law 86-272 be assigned back to California if the property was shipped from California. The California Franchise Tax Board would "throw back" these sales regardless of whether the company reported its income in the destination state as part of a unitary group of which other members were taxable. Finnigan maintained that for purposes of consistency, the word "taxpayer," used in the throw back provision, must mean all of the corporations in the unitary group.
The SBE agreed. It noted that "[t]o hold otherwise would result in an apportionment formula which produced a different tax effect where the unitary business was conducted by the divisions of a single corporation than where it was conducted by multiple corporations. No difference in principle is discernible in the two situations" (id. at *7). On petition for rehearing, the SBE overruled Matter of Joyce, declaring that "Joyce established an unsound rule of apportionment out of fear that the courts would give an expansive interpretation to Public Law No. 86-272 and thereby seriously restrict the application of unitary apportionment principles to multicorporate businesses" (1990 Cal Tax LEXIS 4, *5). This fear having been shown to be unfounded, the SBE considered the latitude granted to states' apportionment formulas in Container Corp. and recent scholarly criticism of Joyce. It concluded that:
"Joyce undeniably contravenes fundamental unitary theory in two important respects. First, by *407 forbidding the assignment of sales to the state of destination in situations where at least one member of the unitary group is taxable in that state, but the actual seller is not, the Joyce rule defeats the basic purpose of the sales factor, which is to reflect the markets for the unitary business's goods and services" (id. at *3).
In 1999, however, the California SBE again reversed course. In order to promote uniformity under UDITPA, it decided to apply the Joyce rule prospectively (see Matter of Huffy Corp., 1999 Cal Tax Lexis 173). It based its decision on the application of the throw back rule, which resulted in two scenarios: "California-based sellers who sell into other states where they are immune from tax as individual corporations will not be subject to tax in any jurisdiction" and "[n]on-California based sellers who sell into California where they are immune but their sister entities are taxable will run the risk of . . . double taxation" (Matter of Huffy Corp., 1999 Cal Tax LEXIS 173, *10). The SBE concluded "[w]hile there were theoretically good reasons for the . . . implementation of the . . . rule," in light of the scenarios above and "to promote uniformity of the UDITPA law" Joyce was the "better law" (id. at *11).
California courts have since defended the Finnigan rule from Public Law 86-272 attack, finding no violation as the apportionment did not amount to a tax (see Deluxe Corp. v Franchise Tax Bd., No. 403-204 [Cal Ct App 2001] ["By applying principles of combined reporting and formula apportionment, California seeks only to determine the income attributable to California generated by members of (the) unitary group. . . . (B)y applying the Finnigan methodology, California does not seek to tax any individual member of (the) unitary group not otherwise subject to tax in the state"]). Thus, the courts analyzing pre-Huffy and post-Huffy tax assessments have determined that either method was legally acceptable (see Citicorp N. Am., Inc. v Franchise Tax Bd., 83 Cal App 4th 1403, 1421, 100 Cal Rep 2d 509, 524 [2000] ["the SBE returned to the Joyce rule without finding legal flaws in the Finnigan rule"]).[7]
*408 That the Joyce rule is recommended by the Multistate Tax Commission[8] in furtherance of consistency under UDITPA, while a valid consideration from a policy perspective, lacks relevance to the preemptive scope of Public Law 86-272. New York has not adopted the Model Act, and "the mere fact that other bodies and jurisdictions did not follow the Finnigan rule is not a valid basis for this court to disregard the considered decision of a constitutionally created quasi-judicial administrative agency" (Citicorp, 83 Cal App 4th at 1418, 100 Cal Rptr 2d at 522).
While choosing the "better" law is not a role we assume here, we note that compelling policies underlie the result we reach. Not to include in the apportionment formula the receipts of entities whose in-state income may well be, in some hard-to-determine part, the result of synergistic relationships with their sister companies would permit corporate groups to avoid taxes by moving income to such entities from other members of the group. While the rule may not benefit companies based in states with throw back rules that follow Joyce, the role of the Legislature is to weigh these considerations in selecting a formula. "In the absence of a central coordinating authority, absolute consistency . . . may just be too much to ask" (Container Corp., 463 US at 192).

D. Constitutional Claims
Finally, Disney's constitutional claims are without merit. The "Constitution imposes no single formula on the States" but merely requires a "`minimal connection' or `nexus' between the interstate activities and the taxing State, and `a rational relationship between the income attributed to the State and the intrastate values of the enterprise'" (see id. at 164, 165-166, quoting Exxon Corp. v Department of Revenue of Wis., 447 US 207, 219-220 [1980]). A tax, further, will not survive Commerce Clause scrutiny if petitioner shows that it (1) applies to an activity lacking a substantial nexus to the taxing state; (2) is not fairly apportioned; (3) discriminates *409 against interstate commerce; or (4) is not fairly related to the services provided by the state (Complete Auto Transit, Inc. v Brady, 430 US 274, 279 [1977]). The tax imposed on the Disney group is not grossly disproportionate to its New York activities, and is both fairly apportioned and nondiscriminatory.
Accordingly, the judgment of the Appellate Division should be affirmed, with costs.
SMITH, J. (concurring).
I agree with the result reached by the majority, and with the reasoning in sections B, C and D of the majority opinion, which I think amply support the result. I cannot join the majority opinion in full, because section A of the majority's analysis seems to me both unnecessary to the decision and wrong.
Section A discusses whether New York is "imposing a tax" on Buena Vista Home Video (Video) by including Video's receipts in the numerator of the fraction used to determine the New York income of a consolidated group of companies. It is unnecessary to decide this question, because this case does not turn on whether New York is imposing a tax on Video. Video is a corporation that transacts business in New York, and it is not immune from New York State tax unless Public Law 86-272 (73 US Stat 555) immunizes itwhich it does not. As the majority explains in section B of its analysis, the relevant "person" for purposes of a Public Law 86-272 analysis is not Video, but the consolidated group. Having decided that, we need decide nothing more.
I find section A not just superfluous, but also wrong, because including a company's receipts in the numerator of the apportionment fraction effectively imposes a tax on that company. Suppose Video were immune from New York taxsuppose, for example, that Video's activities lacked the constitutionally required "minimal connection" to New York (see Moorman Mfg. Co. v Bair, 437 US 267, 273 [1978]). Surely New York could not, in such a case, include Video's receipts in the numerator. To do so would be to increase the tax in proportion to those receiptsand thus in substance to tax the income associated with those receipts (see Shell Oil Co. v Iowa Dept. of Revenue, 488 US 19, 31 [1988] [sales held not taxed "because they are not included in the numerator of the sales ratio"]). The majority cites no authority suggesting otherwise.
Judgment affirmed, with costs.
NOTES
[1] The Tax Commissioner is given the sole discretion to grant an application for combined reporting, or to require a taxpayer to file a combined report when a corporate taxpayer otherwise meets the stock ownership or control criteria for combined reporting (see Tax Law § 211 [4] [a]).
[2] The receipts factor is double-weighted under New York's formula (see Tax Law § 210 [3] [a] [4]).
[3] Disney concedes that Video should have been included in the combined group for each of tax years 1990-1992.
[4] Section 102 (codified as 15 USC § 382) prohibits later assessment of taxes if imposition was otherwise prohibited by section 101.
[5] The Shell Oil Court noted, with regard to inclusion of extraterritorial sales in the preapportioned tax base, that

"[a]ctual sales . . . are not taxed directly by any State because they are not included in the numerator of the sales ratio. From the inclusion of such sales in the apportionment formula's tax base, it does not follow that the dollar amount derived from the formula (which is a fraction of the unitary tax base) includes income not fairly attributable to Iowa" (488 US at 31 [citation omitted]).
As Video's income is fairly attributable to New York sales, we are satisfied that our decision comports with the principles underlying Shell Oil.
[6] California Revenue & Taxation Code § 25122 provides:

"[f]or purposes of allocation and apportionment of income under this act, a taxpayer is taxable in another state if (a) in that state it is subject to a net income tax, a franchise tax measured by net income, a franchise tax for the privilege of doing business, or a corporate stock tax, or (b) that state has jurisdiction to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not."
[7] States, and courts, have split on which rule to follow, although the majority (and those states adopting UDITPA) follow Joyce (see Emerson Elec. Co. v Wasson, 287 SC 394, 339 SE2d 118 [1986] ["taxpayer" an independently taxable entity pursuant to state's throw back rule]; Dover Corp. v Department of Revenue, 271 Ill App 3d 700, 648 NE2d 1089 [1995] [same]; Great N. Nekoosa Corp. v State Tax Assessor, 675 A2d 963 [Me 1996] [same]; but see Airborne Nav., 1987 Ariz Tax LEXIS 34 [adopting rule of Finnigan]; see also Kan Rev Rul 12-91-1 [adopting rule of Finnigan]; Utah Admin Code rule 865-6F-24 [same]; Ind Dept of Rev Tax Policy Directive No. 6 [1992] [adopting Finnigan for permissive combinations]).
[8] The Multistate Tax Commission only has the power to issue nonbinding regulations (see State Taxation, Appendices A and B).