*Blue Buffalo Company, Ltd. v. Comptroller of the Treasury*, No. 495, September Term, 2018, Opinion by Adkins, J.

**CORPORATE TAXATION – IMMUNITY – SOLICITATION OF ORDERS:**

Because the systematic gathering of competitive information exceeded the protection granted to the solicitation of orders, and was not *de minimus*, the corporation's in-state activities were not immune from taxation under 15 U.S.C. § 381. The circuit court correctly upheld the tax court's order.

Circuit Court for Baltimore City
Case No.: 24-C-17-004798

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 495

September Term, 2018

_____

BLUE BUFFALO COMPANY, LTD.

v.

COMPTROLLER OF THE TREASURY
_____

Kehoe,
Leahy,
Adkins, Sally D.
 (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Adkins, Sally D., J.
_____

Filed: December 20, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Federal law provides immunity from state taxation to interstate corporations whose sole business in the taxing state is the solicitation of orders. 15 U.S.C. § 381(a). When the State asserts its rights to tax an interstate corporation that sells its goods within our borders, we look to the Supreme Court's decision in *Wisconsin Dep't. of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 223 (1992) for instruction as to interpreting the statute. At issue here is whether a dog food manufacturer exceeded the scope of the statutory protection when its employees performed various activities in Maryland relating to its product. Upon review, we hold that important aspects of the appellant's activities went beyond the solicitation of orders. We therefore affirm the decision of the Circuit Court for Baltimore City.

### FACTUAL OVERVIEW AND PROCEDURAL POSTURE

Appellant Blue Buffalo Co., Ltd., is a Delaware corporation that is commercially domiciled in the state of Connecticut. Blue Buffalo is in the business of formulating and selling premium pet food. During 2011 and 2012 (the "Tax Years"), these products were produced by independent manufacturers located outside Maryland, shipped into the state by common carrier, and sold through national chains and local independent retailers. Blue Buffalo did not maintain any corporate office, warehouse, storeroom, or distribution facilities inside the state.

Although most of Blue Buffalo's business was conducted outside of Maryland, the corporation maintained several employees inside the state. During the Tax Years, those employees were: one Distributor Sales Manager, one Account Manager, two Regional

Demo Managers, and several dozen "Pet Detectives." The parties dispute the nature, scope, and significance of these individuals' activities during the Tax Years.

Blue Buffalo's management staff was responsible for building the company's relationships with retailers and taking advantage of market opportunities. The Distribution Sales Manager regularly met with the managers of local independent retail stores to arrange bulk orders of Blue Buffalo products. Likewise, the Account Manager met with representatives of national chains that carried Blue Buffalo products—such as Pet Smart, Petco, and Tractor Supply. From time to time, both managers served as a face for Blue Buffalo in the broader community. The Distribution Sales Manager periodically attended pet-related community events, such as adoption fairs and pet walks. The Account Manager organized events in retail stores to demonstrate the advantages of Blue Buffalo's products to ultimate consumers.

Each Regional Demo Manager was chiefly responsible for recruiting, training, and managing Pet Detectives in their assigned geographic area. The Pet Detectives were on-the-ground sales representatives, stationed at retail locations where Blue Buffalo products were sold. Their primary duty was to interact with customers and encourage them to buy Blue Buffalo products from the retailer. They also advised retailers on the proper display of Blue Buffalo products and encouraged retailers to place orders when inventory was running low. The Pet Detectives would provide their Regional Demo Manager with regular reports on detailing sales, pet visits, and hours worked at each store. These reports occasionally included comments on customer interactions, product suggestions, the activities of competitors, and issues encountered on the job.

Blue Buffalo paid Maryland's corporate income tax in 2011 and 2012 for a total amount of $706,966 based on the activities of its Maryland employees. It later filed amended returns for the Tax Years to request a full refund, on the grounds that its staff were limited to the solicitation of orders, an activity protected from taxation under 15 U.S.C. §§ 381-384 ("Public Law 86-272"). After a hearing, the Comptroller determined that Blue Buffalo had not met its burden to show that it qualified for protection under 15 U.S.C. § 381 for the Tax Years. Blue Buffalo appealed to the Maryland Tax Court, characterizing its employees' activities as missionary sales protected by 15 U.S.C. § 381(a)(2). The Tax Court found that several of Blue Buffalo's activities served an independent business purpose, and therefore upheld the Comptroller's decision. The Circuit Court for Baltimore City affirmed, and Blue Buffalo now appeals.

## DISCUSSION

### Standard of Review

On appeal, we review the decision of the Tax Court, rather than the circuit court. *Comptroller of Treasury v. Johns Hopkins Univ.,* 186 Md. App. 169, 181 (2009). We may uphold a Tax Court decision only on the findings and reasons given by the Tax Court. *NIHC, Inc. v. Comptroller of Treasury,* 439 Md. 668, 683 (2014). As the Tax Court is an adjudicatory administrative agency, its final orders are examined under the same standards of review governing other agencies. *Id.* at 682. Findings of fact are reviewed for substantial evidence and entitled to deference if the record reasonably supports the agency's conclusion. *Id.* at 683. Pure questions of law are reviewed without deference. *Ramsay, Scarlett & Co., Inc. v. Comptroller of Treasury,* 302 Md. 825, 834 (1985).

Our review of the Tax Court's application of the law to the facts is generally narrow: "we will not substitute our judgment for the expertise of . . . the administrative agency." *Gore*, 437 Md. at 503-04 (cleaned up). Commensurate with this expertise, an agency's legal conclusions based on interpretations of the statutes and regulations it administers are afforded "great weight." *Id.* at 505. This principle is limited by the "plain meaning" rule of interpretation; that is "where there is no ambiguity and the words of the statute are clear, we simply apply the statute as it reads." *Frey v. Comptroller of Treasury*, 422 Md. 111, 182 (2011) (cleaned up). Likewise, an agency's conclusion predicated on the application of case law presents "a purely legal issue uniquely within the ken of a reviewing court," and will not receive deference. *Id.* (internal citation omitted).

## Defining Solicitation Of Orders

The Tax Court assessed Blue Buffalo's claim under the Interstate Commerce Tax Act, Public Law 86-272, as codified in 15 U.S.C. § 381. Section 381 prohibits states from taxing the net income of an out-of-state corporation whose only business inside the state during the taxable year was one of the following:

> (1) the solicitation of orders by [a] person, or his representative, in [a] State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and
>
> (2) the solicitation of orders by [a] person, or his representative, in [a] State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1).

15 U.S.C. § 381(a).

Congress enacted this provision to define a "'lower limit' for the exercise of the state taxing power" after the Supreme Court upheld state income taxes imposed on interstate corporations based on the activities of their travelling salespeople.[1] *Wisconsin Dep't. of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 223 (1992); *see Comptroller of Treasury v. World Book Childcraft Int'l, Inc.*, 67 Md. App. 424, 432 (1986) (Section 381 bars taxation unless company's activities "meet certain minimum standards"). Section 381(a)(1) protects the **direct solicitation** of orders by an out of state business. Section 381(a)(2) protects an activity referred to as **missionary sales**—solicitation of ultimate consumers on behalf of a third-party retailer, who will eventually place an order to replenish their inventory. *Wrigley*, 505 U.S. at 233–34.

Although § 381 does not define "solicitation of orders," the Supreme Court has issued one decision defining the scope of these protections. In *Wrigley*, it upheld the imposition of Wisconsin's franchise tax on the world's largest manufacturer of chewing gum. *Id.* Wrigley, an international corporation based in Chicago, did not have an office or facility in Wisconsin, did not own or lease property in Wisconsin, did not process orders in Wisconsin, and was not licensed to do business in Wisconsin. Between 1973 and 1978, Wisconsin nevertheless taxed Wrigley based on the in-state income generated by its sales

---

[1] *See Northwestern States Portland Cement Co. v. State of Minnesota*, 358 U.S. 450, 454 (1959) ("We conclude that net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same."); *Heublein, Inc. v. South Carolina Tax Comm'n*, 409 U.S. 275, 280 (1972) (observing the prevailing state of confusion regarding the nature and amount of in-state activities sufficient to impose an income tax).

force.  After the Wisconsin Supreme Court disallowed the tax, the Supreme Court granted the State's petition for certiorari.  *Id.* at 219–220.

Concluding that § 381 "covers more than what is strictly *essential* to making requests for purchases," the Court reasoned that the statute immunizes the entire process associated with requesting orders.  *Id.* at 228 (emphasis in original).  Solicitation, in common parlance,[2] includes both "explicit verbal requests for orders" and "speech or conduct that implicitly invites an order," such as a salesperson's acclamation of the advantages and virtues of his products.  *Id.* at 223.  Moreover, restricting the immunity to requests alone would defeat its purpose, as salespeople must be provided with logistical support and supplies to enable their solicitation efforts.  Therefore, the Court held that 15 U.S.C. § 381 protects activities that are entirely ancillary to the solicitation process—those that serve "no independent business function apart from their connection to the soliciting of orders . . . ."  *Id.* at 229.  That an activity is not ancillary does not end this analysis; unprotected activities only forfeit the statutory immunity when they establish a nontrivial additional connection with the taxing State.  *Id.* at 232.

Ultimately, most of Wrigley's activities were ancillary to solicitation and protected.  *Wrigley*, 505 U.S. at 234–35.  The company's in-state recruitment, training, and evaluation of salespeople were immunized, as the solicitation of orders is the only reason to develop and maintain an in-state sales force.  *Id.* at 235.  Furnishing and refilling display racks,

---

[2] The *Wrigley* Court defined "solicitation" as "asking" for, or "enticing" to, something; alternatively, "to approach with a request or plea (as in selling or begging)." *Id.* at 223.

providing free samples, and distributing promotional literature were likewise protected, as these activities were designed to facilitate missionary sales. Additionally, the regional manager's periodic mediation of credit disputes between key accounts and corporate headquarters was accepted as ancillary to solicitation: "[t]he purpose of the activity . . . was to ingratiate the salesperson with the customer, thereby facilitating requests for purchases." *Id.* at 235.

Nevertheless, several of Wrigley's activities went beyond the solicitation process. Wrigley's sales representatives maintained a personal stock of gum in the state, occasionally renting dedicated space for storage. Every time a sales representative visited a retailer, they would inspect the retailer's inventory for freshness, replacing and disposing of stale gum at no cost. Additionally, sales representatives used their stock to refill empty displays, and issue "agency stock checks" to bill the retailer for the cost of the gum replaced. Taken together, these activities represented a nontrivial connection with Wisconsin sufficient to forfeit the statutory immunity. *Id.* at 233-34.

### Evaluating Blue Buffalo's Activities

From *Wrigley* we distill a two-step analysis to review the decision of the Tax Court. First, we will examine each of Blue Buffalo's activities to evaluate whether they are ancillary to the solicitation of orders—whether they serve no independent business purpose. Second, we will evaluate whether the non-ancillary activities are *de minimis*— whether, taken together, they constitute only a trivial additional connection to the State of Maryland.

Since *Wrigley*, there have been only a handful of reported decisions interpreting 15 U.S.C. § 381(a), and few of any import to our issue today. The Comptroller relies heavily on *Kennametal, Inc. v. Comm'r of Revenue*, 686 N.E.2d 436 (Mass. 1997) in support of taxation, and although we ultimately reject that court's disposition, we agree with its recognition that "[t]here exists no bright line to distinguish those activities that are entirely ancillary to the solicitation of orders from those that also serve an independent business function." *Id.* at 441. The activities and pursuits of salespeople exist "along a continuum" and must be evaluated "on an individual basis." *Id.* The facts in *Wrigley*, although not dispositive, provide "examples at each end of that continuum," and will serve as a useful starting point for our analysis. *Id.* [3]

---

[3] Beyond *Wrigley* and *Kennametal*, the parties largely cite to unreported decisions of tax courts in other jurisdictions. The Comptroller provides passing mention of state appellate cases decided before *Wrigley* that rest on a narrower construction § 381. *E.g., U.S. Tobacco Co. v. Martin*, 801 S.W.2d 256 (Ark. 1990); *Drackett Products Co. v. Conrad,* 370 N.W.2d 723 (N.D. 1985); *National Tires, Inc. v. Lindley*, 426 N.E.2d 793 (Ohio App. 1980). Our independent research reveals only a handful of reported appellate cases applying *Wrigley.* Most of these decisions reference *Wrigley* in passing, and do not provide a relevant analysis. *E.g., Troester v. Starbucks Corp.*, 421 P.3d 1114 (Cal. 2018) (referencing *Wrigley* to illustrate the *de minimis* principle); *Disney Enterprises, Inc. v. Tax Appeals Tribunal of the State*, 888 N.E.2d 1029 (N.Y. 2008) (turning entirely on corporate synergy between Disney and its corporate subsidiary); *Agley v. Tracy*, 719 N.E.2d 951 (Ohio 1999) (applying *Wrigley* but turning primarily on Ohio corporate law). The decisions offering more substantive discussion of *Wrigley* have typically engaged in a fact-specific analysis that is of limited value to our decision. *E.g., Kelly-Springfield Tire Co. v. Bajorski*, 635 A.2d 771 (Conn. 1993) (in-state visits from creditors to ensure collectability of payments constitutes an independent business purpose); *Commonwealth, Dept. of Tax'n v. National Private Truck Council*, 480 S.E.2d 500 (Va. 1997) (company did not exceed solicitation by using its own vehicles to ship goods into the state in response to orders filled out of state).

The Tax Court found that several activities pursued by Blue Buffalo's Maryland salesforce systematically exceeded the scope of 15 U.S.C. § 381. These activities may be generally categorized as: (1) consumer relations activities intended to build customer relationships and community goodwill; (2) product trainings designed to educate retailers; and (3) retail services including inventory management and competitive market research. Blue Buffalo maintains that the bulk of these activities are ancillary to the solicitation process, with only trivial exceptions.

*Consumer Relations*

The Tax Court found Blue Buffalo's Distributor Sales Manager occasionally attended pet-related community events, and the Pet Detectives frequently persuaded in-store consumers to purchase Blue Buffalo products from retailers. The Comptroller further highlights that this latter activity routinely featured conversations with customers about their shared appreciation for pets. The Tax Court determined, and the Comptroller argues, that these activities serve an independent objective of "building general goodwill in the community, ingratiating consumers, and taking advantage of market opportunities." *See Kennametal*, 686 N.E.2d at 441 ("The activities here in question were designed not only to solicit orders, but to ingratiate customers and to assist buyers in knowing what to order."). We are not persuaded by the tax court's legal conclusion or the Comptroller's argument as to this point.

A salesperson's ingratiation of the retail customer is a quintessential form of missionary sale and a classic solicitation technique. When such conversation occurs in a retail setting, the consumer is directly—if not explicitly—invited to purchase the

salesperson's products from the wholesaler's customer. The corresponding increase in sales eventually results in the retailer placing additional orders with the company.[4] Requiring a salesperson to refrain entirely from building consumer relationships to avoid taxation would restrain any sales activity other than direct requests for orders. Such a narrow construction contravenes the statute's express grant of immunity to missionary sales. *See Wrigley*, 505 U.S. at 226 (rejects a definition of solicitation that precludes "any activity other than requesting the customer to purchase the product"). Therefore, we decline to treat consumer goodwill as an independent business purpose in this context.

The Distribution Sales Manager's attendance at community events is another matter. Certainly, in some circumstances, the connection between a company's consumer relations activity and the solicitation of orders might be too tenuous to sustain the claimed immunity. The simple fact that an activity is related to sales is not sufficient to invoke § 381. *See id.* at 229 ("Repair and servicing may help to *increase* purchases; but it is not ancillary to *requesting purchases*, and cannot be converted into 'solicitation' by merely being assigned to salesmen.") (emphasis in original). Moreover, the *Wrigley* Court rejected a standard that would immunize any and all business activities routinely accompanying the solicitation process. *Id.* at 227. Such a sweeping definition would render the immunity entirely subject to corporate discretion.

---

[4] This relationship is clearly articulated in Blue Buffalo's Pet Detective Manual. It describes a detailed, four-step process for bonding with customers, with the specific objective of discovering their pet's needs, steering them towards the product they are more likely to purchase, and welcoming them into the brand. This targeted, deliberate ingratiation is missionary solicitation in its purest form.

Nevertheless, *Wrigley's* treatment of the mediation of credit disputes between retail customers and the company's home office is instructive. *See id.* at 235 ("The purpose of the activity . . . was to ingratiate the salesman with the customer, thereby facilitating requests for purchases."); *Kennametal*, 686 N.E.2d at 441 (when evaluating the scope of 15 U.S.C. § 381, "*Wrigley* guides our analysis . . . with examples at each end of that continuum."). If the goodwill generated by a transaction as attenuated and active as dispute resolution remains ancillary to solicitation, we see no reason why a manager's attendance at community events should be sufficient to forfeit the immunity absent something more. At a minimum, such conduct implicitly invites an order and is a natural component of the solicitation process. Accordingly, we hold that this class of activities does not exceed the statutory protection.

*Product Training Sessions*

The Tax Court found that Blue Buffalo's Distributor Sales Manager "met with customers and potential customers in Maryland and provided them with education, training, and demonstrations on the advantages and selling points of Blue Buffalo products." Likewise, the Account Manager provided product trainings to retail personnel.[5]

---

[5] Although the Tax Court opinion does not discuss the substance of the Account Manager trainings, the record demonstrates that they were functionally equivalent to the trainings conducted by the Distributor Sales Manager. As acknowledged and accepted by the parties in their Joint Stipulation of Facts and Issues, the Account Manager's "Product Trainings" involved "providing Petco and Pet Smart personnel with information on the attributes of Blue Buffalo products."

The Tax Court concluded that each of these activities went beyond the solicitation of orders and are not ancillary to facilitating sales.[6] We disagree.

To support the Tax Court's finding, the Comptroller relies primarily on the *Kennametal* case, in which the Supreme Judicial Court of Massachusetts held that a machine manufacturer's on-site presentations on the proper use of equipment was not protected by § 381. These trainings are distinguishable in degree and in kind. Kennametal produced over 20,000 variants of cutting bits, a machine component that requires precise calibration. Its training sessions were necessarily extensive, running as long as six hours in length before as many as 200 employees. The *Kennametal* Court held that this activity served at least three independent business functions, as the proper use of Kennametal products would improve their efficiency, alleviate the need for detailed instruction manuals, and enhance the company's reputation among buyers. *Id.* at 441–42.

Comparatively, Blue Buffalo makes dog food. Its advice to retailers was limited to the food's nutritional value, its main selling points, and merchandising strategies. This difference is dispositive: where Kennametal had an independent interest in maximizing the effective use of its products, information on the basic nutritional qualities of pet food does

---

[6] The Comptroller separately argues that the training provided to Pet Detectives by Blue Buffalo's Regional Demo Managers is not ancillary to solicitation because the Pet Detectives are best characterized as "product specialists," not "sales representatives." *Compare Wrigley*, 505 U.S. at 234 ("Wrigley's in-state recruitment, training, and evaluation of sales representatives . . . served no purpose apart from their role in facilitating solicitation."), *with Kennametal*, 686 N.E.2d at 441 (finding "frequent in-plant presentations . . . on the use of Kennametal's products" to customers' employees "exceeded the permissible scope of solicitation of orders"). This semantical distinction belies the essence of the *Wrigley* inquiry, which turns on the nature of the activities performed by the employee, not on their title or job description.

-12-

not serve any similar purpose. The only functions of Blue Buffalo's presentations were to directly solicit orders from potential customers, to encourage existing customers to place more orders, and to enable customers to more effectively solicit orders from the ultimate consumer.[7]

Stated more plainly, Blue Buffalo's trainings consisted entirely of product advocacy. To the extent that *Kennametal* can be read to proscribe this conduct, such a ruling is contrary to *Wrigley*. *See Wrigley*, 505 U.S. at 223 ("[A] salesman who extols the virtues of his company's product to the retailer of a competitive brand is engaged in 'solicitation' even if he does not come right out and ask the retailer to buy some."); *see also Amgen Inc. v. Comm'r of Revenue*, 693 N.E.2d 175, 178 n.5 (1998) ("[P]roduct programs for prospective purchasers . . . should not be considered to exceed solicitation of orders as a per se rule."). Discussions of the benefits of Blue Buffalo products are not merely ancillary to solicitation—they *are* solicitation, categorically within the ambit of 15 U.S.C. § 381(a)(1). Accordingly, we hold that Blue Buffalo's product trainings are entirely ancillary to solicitation.[8]

---

[7] Although the record demonstrates Blue Buffalo's Account Manager frequently advised retailers on the placement and marketing of Blue Buffalo products, this form of merchandising falls squarely within the spectrum of activities contemplated by *Wrigley*. *Id.* at 234 ("Advice to retailers on the art of displaying goods to the public can hardly be more thoroughly solicitation.").

[8] In reaching this conclusion, we do not categorically hold that all forms of product training are protected by solicitation. Trainings of a more substantial nature, such as those in *Kennametal*, may serve an independent purpose irrespective of their role in the solicitation process. Trainings that consist entirely of product advocacy, such as those presented under the facts of this case, are not sufficient to obviate the immunity provided by Pubic Law 86-272.

*Retail Services*

Finally, the Tax Court found that Blue Buffalo's Account Manager and Pet Detectives provided the company with various activities that are best characterized as retail services. Activities noted by the Tax Court include: (1) reworking product displays and ensuring products were in stock; (2) reporting customer complaints to headquarters; (3) providing quality control assistance; and (4) obtaining and reporting intelligence on the activities of competitors. The Tax Court concluded that each of these activities is unrelated to solicitation, and that their totality is significant enough to forfeit the statutory immunity. We will consider each of these arguments in turn.

First, the Account Manager and the Pet Detectives occasionally reworked product displays and checked retail inventories to ensure Blue Buffalo products were in stock. The Tax Court concluded these inventory management activities are unrelated to solicitation. We disagree. "Advice to retailers on the art of displaying goods to the public can hardly be more thoroughly solicitation." *Wrigley*, 505 U.S. at 234 (internal quotation omitted). Moreover, unlike the salesmen in *Wrigley*, who sold products directly to retailers through "agency stock checks," Pet Detectives did not maintain a personal stock, did not charge retailers for replacements, and were prohibited from handling orders directly. *Cf. Peterson v. State Tax Assessor*, 724 A.2d 610, 613 (Me. 1999) (transactions conducted within the state forfeit immunity). Rather, the Pet Detectives were simply instructed to ask retailers to fill empty shelves. This is entirely ancillary to their missionary solicitation efforts—a salesperson cannot rightly persuade a consumer to purchase a product that is not available on the shelf.

-14-

Second, the Pet Detectives gathered information from customers attempting to return their products. Nevertheless, it appears undisputed that the Pet Detectives were instructed to report these complaints to Blue Buffalo's corporate headquarters and refrain from handling returns. The *Wrigley* Court found that a salesperson's reporting of disputes to an out-of-state home office is ancillary to solicitation by virtue of its role in ingratiating the customer and facilitating continued requests for purchases. *Id.* at 235. As other states have recognized, the reporting of complaints is entirely analogous to this mediating function. *See Alcoa Bldg. Products, Inc. v. Comm'r of Revenue*, 797 N.E.2d 357, 361 n.2 (Mass. 2003) (recognizing this analogy to distinguish between in-state resolution of complaints, and merely passing complaints to home office). This is good policy and accords with common sense: It would be unreasonable to expect salespeople to ignore customers seeking to return defective products, and it would be deleterious to discourage employees from reporting these complaints on threat of taxation.

Third, the Tax Court concluded that the Pet Detectives and Account Manager each engaged in various forms of quality control. Specifically, the Tax Court found that "at least one Pet Detective restocked retailer shelves on at least one occasion," and that another Pet Detective pulled bad product from shelves. Blue Buffalo disputes the extent of these activities but acknowledges that they occurred. At a minimum, we concur with the Tax Court that these functions are not ancillary to solicitation. As the *Wrigley* Court recognized, quality control and product servicing would be provided by any responsible company independently of its solicitation efforts. *Id.* at 229 ("[E]mploying salesmen to

repair or service the company's products is not part of the 'solicitation of orders,' since there is good reason to get that done whether or not the company has a sales force.").

Fourth, the Pet Detectives and Account Managers periodically provided information regarding market opportunities and competitor activities in their routine reports. The Tax Court characterized this conduct as competitive research and the collection of market data. We agree that competitive advantage is a business objective distinct from the solicitation of orders. As the Tax Court concluded, Blue Buffalo would have reason to gather data about the activities of its competitors independently of whether it deployed a Maryland sales force. Accordingly, we hold that the collection of this information is not ancillary to solicitation and is not categorically protected under 15 U.S.C. § 381.

*Significance of Unprotected Activities*

Having determined some of Blue Buffalo's activities are not ancillary to the solicitation process, we next ask whether the totality of these activities creates a nontrivial additional connection to the State of Maryland. *Wrigley*, 505 U.S. at 232 (["W]hether in-state activity other than "solicitation of orders" is sufficiently *de minimis* to avoid loss of the tax immunity conferred by § 381 depends upon whether that activity establishes a nontrivial additional connection with the taxing State.").

The Supreme Court in *Wrigley* explained that "the venerable maxim *de minimis non curat lex* ('the law cares not for trifles') is part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept." *Id.* at 231. As the Court also said,

-16-

> It would be especially unreasonable to abandon normal application of the *de minimis* principle in construing § 381, which operates in such stark, all-or-nothing fashion: A company either has complete net-income tax immunity or it has none at all, even for its solicitation activities. Wisconsin's reading of the statute renders a company liable for hundreds of thousands of dollars in taxes if one of its salesmen sells a 10-cent item in state.

*Id.*

As implemented by the Supreme Court, this inquiry turns on both the substantiality and frequency of the activities in question. In *Wrigley*, the exchange and disposal of stale gum, the in-state storage of gum, and the in-state sales of gum—endorsed by the company and carried out on a systematic basis—created a substantial connection with Wisconsin independent of the company's solicitation efforts. *Id.*; *accord Peterson*, 724 A.2d at 613 ("[T]he activities are not '*de minimis*' when viewed in the aggregate, because they occurred regularly and consistently over the audit period and thereby established a 'nontrivial additional connection' with the State of Maine.").

Blue Buffalo's employees went beyond solicitation by assisting with restocking and quality control and collecting information on competitors during their retail visits. Yet, applying the second step in our analysis, the quality control activity occurred on isolated occasions and, if considered in isolation, would be *de minimis*. The record discloses only two instances—among thousands of visits—in which Pet Detectives provided the support services referenced by the Tax Court.[9] On this basis, the Tax Court apparently reached its

---

[9] The Comptroller did not identify any other instances, and we have found none in the record.

conclusion that the Pet Detectives "assist[ed] with quality control and inventory issues as they arose." Even applying the deferential substantial evidence standard, these two instances do not surpass the floor of the *de minimis* standard, particularly as the record does not reveal any company policy or continuous course of conduct.

The collection of competitive information, however, is another question entirely. On this point, the Tax Court focused its analysis on the Pet Detectives' reports to the Regional Demo Managers. In these reports, the Pet Detectives were required to track their hours and sales but could provide written comments on an optional basis. In total, Pet Detectives filed approximately 6900 reports during the Tax Years.[10] Only 68 comments— less than one percent of the total—either mentioned or referenced Blue Buffalo's competitors in any form. Those that did were vague and of marginal use to the Company.[11] The question of whether these observations occurred "regularly or consistently"—instead of being "deviations from the norm"—is a close call, one we decline to make. S*ee Peterson*, 724 A.2d at 613; *Wrigley*, 505 U.S. at 231.

---

[10] Of this total, only 735—roughly ten percent—contained written comments of any sort. The vast majority of these comments were limited to casual discussions of the weather, the pace of sales, conditions on the job, suggestions for the company, or interactions with customers and their pets.

[11] The lack of detail in these reports is demonstrative of their triviality. Two examples are typical—"Nutro demo in store," or "Competitive demo was from Simply Nourish." About five to ten comments could be characterized as more detailed, but these comments still amount to casual observations made on the job or recorded customer feedback. Perhaps the most informative comment came on July 17, 2011, when one Pet Detective wrote: "Two pet parents inquired about Blue having a special breeder program like Eukanuba. Eukanuba offers startup packets of food for breeders that use Eukanuba food and provide proof by redeeming UPC codes from food bags. Main issue with [B]lue was cost."

But because we do not view evidence in a vacuum, we also look at other evidence of competitive activity—the Account Manager's collection of competitive information. The Tax Court found that the Account Manager collected competitive information during his trainings and retailer meetings. Although the Tax Court does not describe this activity, our review of the record demonstrates that it was both substantial and deliberate.

Several facts inform this conclusion. Unlike the Pet Detectives, the Account Manager was required to provide written comments with every submission of his regular reports. Of the 538 reports filed during the Tax Years, 23 such reports—four percent of the total—discussed competitors and their activities.[12] Although not numerous, these comments were more concrete and informative than the trivial observations of the Pet Detectives—ranging from the inventory status of competitive products to detailed insights into competitors' marketing strategies.[13] Perhaps most significantly, in February 2012, the header for the comment column in the Account Manager reports was changed from "Store Contacts" to read "Comments and Feedback / Competitive Updates." This shows that the Account Manager's collection of competitive insights was not merely incidental. Rather,

---

[12] Excluded from this analysis are a substantial number of comments that mention competitors in the context of updates on store displays. For example, on August 9, 2012, the Account Manager wrote: "Tammy has agreed to replace Nutro endcap with [Blue Buffalo] endcap after reviewing sales & growth." These comments are a reflection of the Account Manager's solicitation efforts and cannot reasonably construed as competitive market research.

[13] For example, on February 6: "Nutro spending more time in Banfield dropping off 10$ coupons to staff & bringing by food." Likewise, on November 5: "Nutro has sent huge amounts of inventory here and to other Petcos in support of their current promotion." And on December 4: "Chris indicates that Nutro send in [sic] 50-75% on regular natural choice sales as bonus bags in addition to regular bag sales."

it was a function of her job responsibilities and a regular incident of her discussions with retailers.

Much like the gum transactions in *Wrigley*, the Account Manager's collection of competitive information was carried out on a regular basis as a continuing matter of company policy. The relative infrequency of the reports does not meaningfully undermine this finding. Viewed in the aggregate and taken alongside the more vague reports provided by the Pet Detectives, the competitive intelligence gathered by Blue Buffalo constitutes a nontrivial additional business activity conducted in the State of Maryland. Accordingly, we hold that Blue Buffalo's unprotected activities exceed the scope of the protections provided by 15 U.S.C. § 381.

## CONCLUSION

As interpreted by the Supreme Court, the grant of immunity provided by 15 U.S.C. § 381 is broader than the construction it was afforded by the Tax Court, but nonetheless remains limited in scope. *Id.* at 226. This statute does not provide a blanket protection for an industry to conduct unfettered activities in the name of sales. Rather, corporations may only claim immunity when the totality of their in-state activities is ancillary to the solicitation process—as judicially defined—with only trivial exceptions. While we recognize that some of Blue Buffalo's activities were protected, we nonetheless hold that collection of competitive information by the Pet Detectives and Account Managers is sufficient to forfeit this immunity. Accordingly, we affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**